# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00536-CR

**Dana Pierce, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT
NO. 02-615-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted Dana Lynne Pierce of murder and assessed punishment at sixty years in prison. *See* Tex. Pen. Code Ann. § 19.02(b) (West 2004). Pierce does not deny killing Shawn Rendon or challenge the sufficiency of the evidence to support her conviction, but complains on appeal that the court erred by allowing the State to invade her attorney-client privilege on cross-examination by asking her about the frequency of her contact with her attorney and whether she was being "coached." She further asserts that the court erred by admitting certain evidence. Pierce also contends that she was denied effective assistance of counsel. We will affirm the judgment.

## BACKGROUND

Pierce had known Rendon for eight years and lived with him for about three years. At the time of the events giving rise to Pierce's conviction, their relationship was deteriorating and they were planning to move apart. Pierce blamed Rendon's mood swings and sexual desires and practices.

According to Pierce, Rendon forced her to have anal sex the day before she shot him. She testified that she had been greatly disturbed by the episode, and was further upset when he forced her to perform oral sex on him the next morning. Pierce later worked up the courage to confront Rendon and tell him that she wanted to seek counseling for her feelings about the anal sex. She testified that Rendon insisted that she not talk about the matter with anyone because it would eventually be disclosed and harm his reputation. Instead, Pierce recounted, Rendon wanted to have sex again, this time with various sexual aids. Pierce refused and angered Rendon by repeating that she wanted to talk to someone about the anal sex episode. Pierce said that she tried to walk away from him, but he blocked her path, yelled at her, pushed her into a shelf, and swung her into a mirror. She feared he was going to force her to have sex again. Rendon then pushed her down into the closet, causing her to break a shoe rack and knock over a shotgun. Pierce picked up the gun and asked him to let her leave.

Pierce testified that they struggled and that Rendon grabbed her by the hair. She thought he was going to kill her. She recounted that, at some point, the gun fired. At this juncture, Rendon still blocked her path and leaned toward her. Pierce initially did not remember a second

2

shot, but conceded that it might have happened. When Rendon fell on the floor in the adjacent kitchen, she said she called 911.

Peace officers responding to the scene found Rendon dead. They concluded that he had been shot once while in the bedroom and once while in or near the adjacent kitchen. A blood-spatter expert testified that the second shot was fired while Rendon was on his knees in the kitchen, possibly trying to use the telephone. A firearms expert testified that the first shot was fired from three to eight feet away from Rendon, and the second shot was fired from less than six inches away. There was evidence of a time lag between the two shots, and evidence that one shell failed to fire in the bedroom, supporting the State's theory that Pierce fired once, had a misfire, then fired the third shot in the kitchen.

Many other witnesses testified. Numerous witnesses testified that Rendon had abused Pierce verbally, emotionally, and psychologically, and that Pierce was passive and afraid of Rendon. Pierce testified that she intended only to hurt Rendon, and shot him because she had no choice. Pierce's experts testified that she exhibited classic signs of being abused and that she did not intend to kill Rendon, only to protect herself.

The State called several rebuttal witnesses who challenged Pierce's description of herself, her capacity to tell the truth, and her description of Rendon as abusive. Some also described Pierce's debts rising into the tens of thousands, including a debt to Rendon. Evidence also showed Pierce was served with a lawsuit on one of those debts only days before she killed Rendon.

During the guilt-innocence phase of trial, the district court charged the jury on murder and self-defense, as well as the offenses of sexual assault and aggravated kidnapping, from which

Pierce might have defended herself with deadly force. *See* Tex. Pen. Code Ann. § 9.32(a)(3)(b) (West 2003). The jury found her guilty of murder, implicitly rejecting her claim of self-defense. At the punishment phase, the court instructed the jury regarding sudden passion and community supervision. The jury expressly did not find that Pierce murdered Rendon under the influence of sudden passion. The jury assessed sentence at sixty years in prison, vitiating her request that the jury recommend she be placed on community supervision.

## DISCUSSION

Pierce raises six issues on appeal. She complains that the court allowed the State to invade the attorney-client privilege on cross-examination by asking her about the frequency of her contact with her attorney and whether she had been coached. She adds that the court admitted some evidence that improperly attacked her character for truthfulness and other evidence that concerned the irrelevant subjects of her interest in pornography and of Williamson County's history of rarely placing murderers on community supervision. She also complains that her counsel rendered ineffective assistance.

### Invasion of attorney-client privilege

By her first issue, Pierce contends that the court erred by overruling her objections to questions by the State that she contends invaded the attorney-client privilege. She complains about a series of questions by the State that she argues implied that her attorneys coached her testimony both before and during trial. While attempting to impeach Pierce using prior statements inconsistent with her testimony, the State asked, "Over the past several months, Ms. Pierce, how

4

much time have you spent with your attorneys?" After the court overruled Pierce's objection to that question, the State asked fourteen more questions (only one of which was objected to) about the frequency, duration, location, and recency of Pierce's contacts with her attorney, culminating with the State asking if Pierce and her attorney had established a means of communicating about the year in which something occurred: "So, if people in the audience have observed that it appeared that if the year was 2000, Ms. Davis-Jones made some sort of a circle with her hand if the year was 2001 there was some pointing that went on—." Pierce interrupted and denied being coached, saying that she figured out the year without signals from her attorney.

The rule establishing attorney-client privilege provides, in relevant part, that a client may refuse to disclose and may prevent the disclosure of confidential communications made for the purpose of facilitating the rendition of professional legal services to the client among the client, her representatives, her lawyer, and her lawyer's representatives. *See* Tex. R. Evid. 503(b)(1). A client in a criminal case also may prevent her lawyer or her lawyer's representatives from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship. *See id*. 503(b)(2). The purpose of the attorney-client privilege is to promote communication between attorney and client unrestrained by fear that these confidences may later be revealed. *Austin v. State*, 934 S.W.2d 672, 673 (Tex. Crim. App. 1996). Statements and advice of the attorney are just as protected as the communications of the client. *Id*. But the lawyer-client privilege is only an exclusionary rule of evidence, not a principle of constitutional proportions. *Strong v. State*, 773 S.W.2d 543, 547 (Tex. Crim. App. 1989). Thus, if the trial court erred, we may reverse only if the error affected substantial rights. *See* Tex. R. App. P. 44.2(b).

5

In this case, no error was committed. We find no authority for the proposition that the State cannot inquire whether, how often, how long, and how recently Pierce had met with her attorneys. Further, in the question about hand signals, the State was asking about hand signals purportedly observed in open court while Pierce was on the stand; it did not call for disclosure of confidential communications. Pierce's answer, moreover, did not disclose any confidential communications because she flatly denied that her attorney made any hand gestures, did not disclose any underlying communications, and did not imply that she had participated in any discussions intended to shape her testimony. We overrule her first issue.

**Evidence of character for truthfulness**

By her second issue, Pierce complains that the district court erred by admitting evidence of specific instances of conduct regarding her character for truthfulness. Although Pierce mentions numerous instances in which the State asked Pierce about specific instances of conduct, these form merely the background of her appellate complaint because she did not object to any such questions posed to her. Instead, she focuses on testimony by Jody Willis, a one-time friend and co-worker. Pierce objected when the State asked Willis, "At some point did you come to form an opinion about the Defendant's capacity for truthfulness?" Pierce objected:

> Counsel knows the proper way to impeach a person's reputation, and this is clearly not it. All this testimony is duplicative. The Defendant has testified and now Miss —Ms. McCown is just going over what was repeated to people. Now this is just a way to smear her character, and we're going to hear more of it before the day is out, I fear.

6

The State argued at the bench that Pierce had put her truth-telling capacity at issue. Without ruling, the Court responded, "Well, if you'll stick to areas where this witness can contradict previous testimony of the Defendant. As I understand it, however, reputation evidence is very formulaic and specific instances are not permissible." The State argued that opinion evidence is permissible if a defendant puts her truth-telling ability at issue by testifying. The court replied, "Okay. Let's stick to those two areas." The State did not repeat its request for Willis's opinion on Pierce's capacity for truthfulness, but prompted Willis to discuss how her friendship with Pierce dissipated as Willis came to disbelieve some of Pierce's representations.

We review the admission of evidence for an abuse of discretion, and can reverse only if the court's ruling is so clearly wrong that it lies outside the zone of reasonable disagreement. *See Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990) (op. on reh'g). A witness's character for truthfulness cannot be impeached by specific instances of conduct other than convictions for crimes. *See* Tex. R. Evid. 608(b). To preserve error, an appellant must show that she made the complaint to the trial court by timely objection that stated the grounds for ruling with sufficient specificity to alert the trial court to the basis of the complaint. *See* Tex. R. App. P. 33.1(a)(1). An appellant must also show that the trial court either ruled on the objection expressly or implicitly or that the appellant objected to the refusal to rule. *Id*. 33.1(a)(2). A complaint on appeal must comport with the trial objection or nothing is presented for review. *See Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990); *Bunton v. State*, 136 S.W.3d 355, 364 (Tex. App.—Austin 2004, pet. ref'd).

7

Pierce did not complain at trial that the evidence was inadmissible under Rule 608. Pierce complained that the State was not impeaching her properly, but the only specific basis stated was duplicativeness. This objection did not alert the court to her appellate complaint that the questions improperly concern specific instances of conduct regarding her character for truthfulness. Further, the court did not expressly rule on the objection; the court discussed the objection and provided guidance to the State regarding the course of questioning. Finally, the State did not reiterate the question about Willis's opinion on Pierce's capacity for truthfulness after the objection and discussion, and Willis did not answer it. We find no reversible error preserved on this issue.

**Evidence of interest in pornography**

By her third issue, Pierce contends that the district court erred by admitting evidence regarding her alleged interest in pornography. She complains of the admission of an e-mail from Pierce to Rendon entitled "Yummy Pics." Attached were several pictures explicitly showing oral, vaginal, and anal sex involving persons other than Pierce and Rendon. The e-mail was dated April 30, 2001—over a year before Pierce killed Rendon on May 15, 2002.

Pierce contends that these photographs were irrelevant and that any relevance was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 401, 403. Pierce admitted in her direct testimony that she forwarded sexually explicit pictures to Rendon via e-mail. She also described a sex life with him that grew more experimental, rougher, unpleasant, and nonconsensual. She testified that she forwarded pornographic pictures to Rendon only if she inadvertently found them in the computer after his internet explorations. She argues that the images

8

did not make any contested fact more or less probable. She contends that the fact that she forwarded the photos does not mean that she looked at them, much less enjoyed them. She argues that the only purpose was the highly prejudicial intent to portray her as sexually depraved and a liar.

The State responds that it offered the message to counteract the impression Pierce created during her testimony that she was an unwilling participant in various sexual acts with Rendon. The State argues that her sending the images to Rendon shows that she was interested in the acts depicted therein.

In weighing the probative value of offered evidence under Rule 403, the district court considers factors including (1) the evidence's inherent probative value; (2) its potential to impress the jury in some irrational but indelible way; (3) the amount of time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002). Even relevant evidence must be excluded when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value. *Jones v. State*, 944 S.W.2d 642, 653 (Tex. Crim. App. 1996). We review the court's conclusion for an abuse of discretion. *Montgomery*, 810 S.W.2d at 390.

We conclude that the district court did not abuse its discretion by finding this evidence relevant and admissible. Pierce presented a defensive theory that she was subject to a campaign of increasing psychological domination and sexual deviancy orchestrated by Rendon. This theory formed the background for her contention that he raped her anally the day before the shooting, and supported her theory of the dispute she had with Rendon and provided the basis for her fears for her safety on the day of the shooting. Although forwarding the photos did not necessarily show

9

Pierce's approval of the activities depicted, the jury could infer that the e-mail undermines her general defensive theory that she was an unwilling participant in any of the activities—particularly when the photos are viewed in conjunction with the title of her e-mail: "Yummy Pics." We emphasize that sending these photos does not prove acquiescence to being raped or to participation in any of the other specific activities she says she did not consent to performing. But the district court did not abuse its discretion by concluding that the e-mail and photos relate to Pierce's depiction of the level of her voluntary involvement in the general course of their sexual activities and their relationship, which also bears on her version of events on the day of the shooting—including whether they had a dispute about these activities while she feared for her safety.

We further conclude that the district court did not abuse its discretion by deciding that the probative value of the evidence was not substantially outweighed by its potential unfair prejudicial effect. Although the photographs might have been shocking or unpleasant to view for some of the jurors, the acts depicted therein are less unusual and violent than some of the activities in which Pierce had testified she was forced to participate; this context diminishes the likelihood that the photos would influence the jurors in an irrational, indelible way. This evidence did not take much time to introduce, and the State needed the evidence to counter Pierce's testimony that she was an unwilling participant in activities like those depicted in the photos. The district court reasonably could have concluded that the risk of unfair prejudice did not substantially outweigh the probative value of this evidence. We conclude that the district court did not abuse its discretion by admitting this evidence.

10

**Evidence about community supervision in Williamson County**

By her fourth issue, Pierce contends that the court erred by admitting evidence concerning Williamson County's history of rarely placing convicted murderers on community supervision. At the punishment phase, Pierce called Rick Zinsmeyer, the director of the Williamson County Community Supervision and Corrections Department, to discuss how community supervision worked. On cross-examination, the State asked him if any murderers convicted in Williamson County were currently on community supervision; he responded, "I don't think so, but I didn't check. I just found out I was going to be here 20 minutes ago. But we've had some in the past." The State then asked him to talk about particular people who had been placed on probation for murder; after an objection, the State asked whether he recalled someone being placed on probation for a shotgun killing. Pierce again objected to the reference to a specific case, arguing that it was not relevant to Pierce. The court overruled the objection, and Zinsmeyer testified as follows: "I don't know what kind of firearm was used. And the one that jumps out at me was in 1977, and I—I feel like there's been some—I just don't recall, but I remember that because I supervised the case. And since I don't supervise cases anymore, I just don't recall."

The criteria for making relevancy determinations at the punishment phase differ because the use of evidence differs. At the punishment phase, there are fewer defined elements to be found; the court of criminal appeals wrote, "Because the material issue at punishment is so indistinct, relevancy of proffered evidence cannot be determined by deductive processes." *Sunbury v. State*, 88 S.W.3d 229, 233 (Tex. Crim. App. 2002). Accordingly, "determining what evidence should be admitted at the punishment phase of a non-capital felony offense is a function of policy

rather than a question of logical relevance." *Id*. Some of the policy considerations include giving complete information for the jury to tailor an appropriate sentence for a defendant; the policy of optional completeness; and admitting the truth in sentencing. *Id*. Although the criteria the trial court uses differ, we review the decision for an abuse of discretion. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996).

The State contends that Pierce failed to preserve this error, arguing that the objection overruled at trial was to a narrow question concerning a shotgun murderer getting probation, but the complaint on appeal is to evidence on the broader issue of murderers getting probation. In context, however, Pierce's objection was to any inquiry into other cases. She first objected to a broad question about murderers getting probation; when the State rephrased—without the court ruling on the objection—and asked specifically about probation based on a "shotgun killing," Pierce again objected that "[t]his is just another way around here. This is a reference to a specific case. It's not relevant to Dana Pierce." We find the asserted error adequately preserved for our review.

That Zinsmeyer could recall only one other murderer who used a shotgun receiving probation has little relevance to what sentence Pierce should receive. The testimony does not prove, as the State contends, that the probation department could not adequately supervise a convicted murderer; rather, it shows that the department is not often called upon to do so. But neither did the testimony, as Pierce contends, invite the jury to speculate about how other murderers were sentenced in Williamson County without providing *any* information about the other cases; it showed that probation for murderers was rare. This evidence is at most indirect evidence of the appropriateness of probation, which the court can admit if the evidence will not confuse the jury. *See Ortiz v. State*,

12

834 S.W.2d 343, 348 (Tex. Crim. App. 1992). But this evidence does not explain whether other murderers who used shotguns did not get probation, whether this was appropriate, or whether or how those cases should inform the jury regarding their decision on Pierce.

Any error in the admission of this testimony did not harm Pierce. Because admission of this evidence is not constitutional error, we cannot reverse unless we find that the error affected the substantial rights of the appellant. *See* Tex. R. App. P. 44.2(b)(2). Substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000) (quoting *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). There was ample other evidence relevant to punishment. There were more than two weeks of evidence at the guilt-innocence phase that covered the nature of the crime as well as Pierce's conduct and motivations. At the punishment phase, the State called Rendon's mother to discuss the effect of the loss of her son. Pierce called two witnesses to discuss probation and a third to talk about her friendship with Pierce. The fact that the sixty-year sentence far exceeds the maximum ten-year length for a sentence that could be probated indicates strongly that the jury based its sentence, and the implicit decision not to recommend community supervision, on evidence other than Zinsmeyer's comments. We conclude that the information that community supervision for murderers was rare in Williamson County had no effect on the sentence.

**Ineffective assistance of counsel**

By her fifth and sixth issues on appeal, Pierce argues that she was denied effective assistance of counsel in violation of both the state and federal constitutions. Pierce complains that

13

her counsel was unprepared to deal with the various ways in which her credibility would be attacked. She argues that these credibility challenges crippled her assertion of self-defense.

The federal and state constitutions guarantee the right to the reasonably effective assistance of counsel in a criminal proceeding. U.S. Const. amend. VI; Tex. Const. art. I, § 10. To show ineffective assistance of counsel, a defendant must show that (1) his trial counsel's performance was deficient, in that counsel made such serious errors he was not functioning effectively as counsel; and (2) the deficient performance prejudiced the defense to such a degree that the defendant was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting *Strickland* standard for state constitutional violations).

A strong presumption exists that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 694. The strong presumption is that counsel's conduct fell within the wide range of reasonable professional assistance. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The challenged conduct will not constitute deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2002).

Review of a defendant's claim of ineffective assistance must be highly deferential to trial counsel. *Thompson*, 9 S.W.3d at 813. We do not speculate about trial counsel's strategy. *Blevins v. State*, 18 S.W.3d 266, 271 (Tex. App.—Austin 2000, no pet.). Rather, in the absence of direct evidence in the record of counsel's reasons for the challenged conduct, an appellate court will

14

assume a strategic motivation if any can be imagined. *Garcia*, 57 S.W.3d at 440. The defendant must show "a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Thompson*, 9 S.W.3d at 812. A reasonable probability is one that undermines confidence in the outcome. *Id*. The record must affirmatively demonstrate the alleged ineffectiveness and, in most cases, the trial record alone will be insufficient. *Thompson*, 9 S.W.3d at 813. But claims of ineffective assistance can be successful if the appellate record is sufficiently developed. *See Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000).

Pierce complains about several instances in which her counsel's performance was deficient while she was being examined; her complaints depend on the trial record alone because there was no hearing on the motion for new trial. She complains about the failure to object to improper questions while the State was cross-examining her; these questions concerned her financial status and relocation plans. She also complains that the State adduced responses from her that set up "straw men" that the State could then impeach with prior inconsistent statements; she gives the example of the State adducing her denial that she ever told anyone that she had a trust fund or that her grandfather gave her $100,000, which the State then rebutted with testimony from witnesses who said she had made those statements.

Pierce also complains about counsel's performance while other witnesses were being examined. She assails her counsel's failure to object to her landlord's testimony about instances in which Pierce lied about making arrangements to pay her late rent, Willis's testimony about details of Pierce's scheme to collect disability payments and other lies, and other witnesses' testimony about lies Pierce told them. She also complains that her counsel failed to object to the State's failure to

lay the proper predicate for impeachment of her claims of prior sexual abuse and the State's violation of a motion in limine regarding Pierce's arrest for theft by check. She attacks her counsel's failure to object to the elicitation of testimony that she had temper tantrums, that she requested disability leave because she did not like her job, and that Pierce's ex-husband was not surprised to hear that she shot Rendon. Pierce also argues that her counsel was ineffective for eliciting testimony from a State's witness regarding Pierce's statement that she could not receive a fair trial in Williamson County.

Finally, Pierce contends that her counsel was ineffective during argument at the punishment phase for failing to remind the jury of the sudden passion instruction and for appealing to the jury to give her probation so as not to separate her from her children. Pierce found the latter particularly ineffective because the State then argued that invoking the children as a reason for decision was essentially shameful and exploitative; she points to the fact that jurors wanted to meet with prosecutors, but not the defense, after the trial as proof that her counsel's techniques alienated the jury so much that she was deprived of the effective assistance of counsel.

Pierce's complaints about her counsel not objecting to various evidence about her monetary difficulties fail because that evidence was admissible to show motive under the State's alternative theory of events. *See* Tex. R. App. P. 404(b). The evidence about her debts could support a view of her motive—that Pierce was desperate to prevent Rendon from leaving because she owed him and others so much money; indeed, evidence showed that she owed him between $5,000 and $20,000 and was served two days before the shooting with a civil petition seeking repayment of another debt. Thus, the evidence rebuts Pierce's self-defense claim by showing a

16

different motive. Pierce's counsel was not ineffective for failing to object to admissible evidence. *See Ortiz v. State*, 93 S.W.3d 79, 93-95 (Tex. Crim. App. 2002).

Similarly, evidence rebutting her version of events surrounding her leave of absence from work was relevant to motive. She testified that she took the leave of absence because of the combination of effects from childhood sexual abuse and her relationship with Rendon. Evidence that she concocted the symptoms that substantiated her obtaining the leave in order to get paid for work and not get laid off undermine her claim that she was a psychologically battered woman who shot Rendon in self-defense. Her counsel was not ineffective for failing to object to this admissible evidence. *See id*.

The testimony that Pierce was arrested for theft by check came in through a peace officer's testimony about the circumstances surrounding Pierce's statement to law enforcement. The State asked if Pierce was arrested after giving her second statement. The officer responded, "Yes, she was. She was arrested for a theft-by-check warrant that she had outstanding." The State then asked if the officer obtained a warrant for murder, and the officer confirmed that he did. Shortly thereafter, Pierce's counsel asked to approach the bench and noted that the officer's testimony about the theft-by-check charge violated a motion in limine; she stated her intention to elicit evidence that the charge had been dismissed. On cross-examination, the officer admitted that he did not know that the charge had been dismissed. This method of dealing with the mention of the extraneous charge may have de-emphasized its importance to the jury. *See Castoreno v. State*, 932 S.W.2d 597, 603 (Tex. App.—San Antonio 1996, pet. ref'd). We do not find that Pierce's counsel was ineffective for failing to object in the presence of the jury to the initial mention of the charge.

17

Nor was Pierce's counsel ineffective for failing to object to testimony by her ex-husband. By raising a defensive theory, the defendant opens the door for the State to offer rebuttal testimony regarding an extraneous offense if the extraneous offense has common characteristics with the offense for which the defendant was on trial. *See Bell v. State*, 620 S.W.2d 116, 126 (Tex. Crim. App. 1980) (op. on reh'g). Pierce's ex-husband testified about his lack of surprise when hearing that Pierce shot Rendon shortly before he was to leave for work. He testified that she often started arguments shortly before he was to leave for work and that she sometimes threw dishes at him when they argued. This tends to rebut the characterization of Pierce by other witnesses as a quiet, undemonstrative, and passive person, and shows a different state of mind and intent for the argument than she portrayed herself as having. Counsel was not ineffective for failing to object to this admissible evidence. *See Ortiz*, 93 S.W.3d at 93-95.

The record does not demonstrate that Pierce's counsel was ineffective for failing to argue for a sudden-passion finding at the punishment phase. The instruction was given to the jury. The record does not show whether the failure to argue the issue was a lapse or an intentional omission. Pierce's counsel focused on persuading the jury to recommend probation, noting her compliance with pre-trial supervision. Given the jury's rejection of self-defense at guilt-innocence, counsel may have chosen to attempt to create sympathy for Pierce in spite of her action rather than ask the jury to "excuse" her action. The failure of that strategy does not render counsel's performance constitutionally deficient. On this record, we cannot say that the strategy was unreasonable. *See Garcia*, 57 S.W.3d at 440.

Pierce's counsel represented her actively before and during the trial, filing motions, questioning witnesses, and making objections. There was no evidence developed at a motion for

18

new trial about possible trial strategies. The acts and omissions of which Pierce complains do not show deficient performance by her counsel on this record.

## CONCLUSION

Having resolved Pierce's issues in favor of the judgment, we affirm the conviction and sentence.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed:   August 3, 2005

Do Not Publish

19